Bentley, J.
We have carefully considered the questionsarising upon the demurrer to the second defense in this case, and have consulted the authorities cited, except an Iowa case, which is inaccessible. In this second defense there is no denial of the allegations in the petition regarding Sixteenth street being a public street duly dedicated. That denial is contained in the first defense; hut the second defense sets up certain affirmative matters by which it is sought to estop the plaintiffs, as follows : That even conceding, for the sake of this discussion, that this street was a public street, yet from the fact that since 1860 the city has taxed it, and the defendant from time to time has paid taxes and assessments upon it, and from the further fact that the city, in 1873-5, and at other dates sought to' *317 condemn it for street purposes, and that the defendant here, in those cases was allowed damages (which, however, were never paid,' and the street not taken possession of by the city under these proceedings) ; that from the fact that the city has treated this property in this way, it is estopped from asserting that it is a public street, and that the plaintiffs are therefore estopped in like manner.
It seems to us that the mere fact that the city has taxed this property for a series of years, and that the defendant, for some reason or other, has paid the taxes, would not necessarily estop the city, or those claiming under the public right, from claiming that it was in fact a public and duly dedicated street.
The judgment in the condemnation proceedings would, of course, have no more effect than it would under the general statute. Condemnation proceedings are not proceedings in which questions of title can be settled-or adjudicated. When judgment is rendered the city may or may not take possession of the property and pay the condemnation money. Whether the property sought to be condemned belongs to one person or another is not settled, and cannot be settled in condemnation proceedings. The most that can be" alleged for these things in the second defense would seem to be that they might be evidence bearing upon the question at issue; whether in fact this street is a public street, whether it has been so regarded and so treated. For these purposes it is possible that these matters may be used as evidence bearing upon that question. But that they are sufficient to have a greater effect, and to amount to an estoppel, we cannot conclude.
It is also set forth in this second defense that plaintiff Daiber, “at the time he purchased the lot now claimed to be owned by him, agreed, and by the deed conveying the title, undertook upon his part to pay for the costs of opening and extending Sixteenth street alongside of his said lot, which extension contemplated the taking of the lot, owned by this defendant as aforesaid, in case said Sixteenth street should be opened and extended.” It is claimed that there is enough involved in this allegation, together with the other matters in the answer, to constitute an estoppel. But it is not alleged, and does not appear anywhere, that the defendant was in the line of this title, or that *318 this agreement, however made, was at all for the benefit of the defendant, or that he was in a situation to take advantage of it. It was a mere matter between the parties to that particular deed, and it does not appear that the defendant was so connected with it that he could take advantage of the recitals of that deed, whatever they were.
Now, it is further alleged in this second defense, “ That at the time when the defendant made the improvement complained of, both of the plaintiffs resided in the vicinity, and had full knowledge that such improvements were contemplated, and that the same were being made, but made no complaint to defendant or protest against the building thereof; nor did they at the time claim or for a long time thereafter claim that said improvements obstructed any right claimed by them in said extension of Sixteenth street.”
It is not alleged that the plaintiffs in that case did any active thing by way of encouragement to the erection of these buildings. They simply stood by and made no protest or objection. It does not seem, for all that appears in this pleading, but that at the time this building was erected the defendant had as full knowledge of the situation regarding this street as did the plaintiffs. And it does not' appear by this averment that the defendant did any other thing differently from what he would have done on account of what the plaintiffs did, or failed to do. He was going to build, and they knew it; he was proceeding to build, and they made no objection. We think there is not sufficient facts in these allegations to constitute an estoppel. Treating the second defense together as we must, we are unable to find that the allegations therein contained constitute a defense to the action. Whatever the effect of the facts therei|i recited may have upon the issue in the case, made by the general denial in the first defense, we have decided that the demurrer to the second defense should be sustained, and it is so sustained.
Bentley, J.
(rendering the opinion of the court upon the merits of the case).
The plaintiffs in this case allege that they are the owners of certain lots in the city of Toledo, that abut on Sixteenth *319 street, plaintiff Daiber’s lot being upon the corner of Jefferson street and Sixteenth street, and plaintiff Southard’s premises abutting u^on Sixteenth street. They allege that Jefferson street and Sixteenth street are public streets and highways in the city of Toledo, and have been for a number of years. That the defendant, Maurice A. Scott, in 1884, obstructed a certain portion of Sixteenth street by building therein certain houses, fences, and other structures, and that they intercept the view, the light and the air of plaintiff Daiber, and are also an obstruction, an annoyance and a nuisance to both the plaintiff Southard and the plaintiff Daiber. They bring this action to restrain the defendant from continuing these nuisances in the public street, and the question made in the case is, whether Sixteenth street, where it is obstructed by the defendant with his buildings, is or is not a public street.
There is no dispute as to the erection of the structures complained of in the locality specified, and that the defendant is maintaining them, and has maintained them there since 1884.
The defendant denies that he obstructs any public street; denies in effect that Sixteenth street, as designated by plaintiffs, is or was a public highway or street of the city.
In 1837, January 7th, an act was passed by the legislature of the state of Ohio, specially incorporating the city of Toledo. The first section of the act defines the boundaries of the city, and it is sufficient to say those boundaries include the land-in controversy here, and, of course, very much other land. Section 30 of that act provides:
“ This act shall be taken-and received in all courts and by all judges, magistrates, and other public officers as a public act, and all printed copies of the same which shall be printed by or under the authority of the general assembly shall be admitted as good evidence thereof without any other proof whatever.”
At that time, so far as the evidence shows, the only plats of lands laid out in lots within the limits of the city as designated by this act, were perhaps three ; the plats of Vistula, Port Lawrence and Oliver’s additions, so-called. Something is said about an unrecorded plat of Scott’s addition ; whether that was in existence as early as this is uncertain.
*320 The boundaries of Toledo, as prescribed in the act of incorporation, included those plats and a large amount of land besides. A portion of this land was a farm of some 80 acres, commonly called the Bartlett farm, being the/southeast fractional quarter of section 35, town 9, south of range 7 east, and the northeast corner of this farm was cut off by what was called the Territorial road; Jefferson street, Monroe street and Madison street now run through it. This farm was not platted and was used at that time as farming land.
Section 28 of said act incorporating the city of Toledo, among other things, provides as follows:
“ The city council shall cause the public streets, roads, lanes, alleys, highways and other public grounds, that now exist within the limits of said city, to be by some competent surveyor surveyed, described and permanently marked, and a plat thereof recorded by the city clerk, in a book to be provided for that purpose, in which book shall also be recorded a plat of any new street which may hereafter be established by said council under the provisions of this act, and also of any change or alteration in any of the streets or highways of the city, and such survey and record shall be thereafter conclusive evidence of the position and limits of such street, lane, alley, highway or public ground. Subject, however, to such alterations as may be made therein agreeable to the provisions of this act.”
. October 31st, 1837, William Martin, county surveyor of the county, appointed specially Robert Gower to make a survey of lots and lands in Toledo, such survey being then provided for by a law found upon page 1483, Swan & Critchfield. Section 6 of said act is as follows :
“ That all proprietors of lots or grounds in any city or town corporate in this state, who have subdivided or laid out, or who shall hereafter subdivide or lay out the same in lots for sale, shall cause accurate and true maps or plats thereof to be recorded in the office of the recorder of the county in which such town or city may be situated; which maps or plats so to be recorded shall set forth and describe with certainty all grounds laid out or granted for streets, alleys, ways, commons, or other public uses; and all the lots sold or intended for sale *321 by progressive numbers, or by the squares in which they are situated, and the precise length and width of each and every lot; and shall be acknowledged before a justice of the peace, or some other officer authorized'by law to take and certify acknowledgments of deeds, and shall be certified by the officer taking the same, in the manner prescribed for the proof and acknowledgment of deeds; and such map or plat so recorded, shall be deemed a sufficient conveyance to vest the fee of the parcel or parcels, of lands therein set forlh and described, or intended to be for streets, alleys, ways, commons, or other public uses, in such city, or town corporate, to be held in the corporate name thereof, in trust to, and fór the uses and purposes so set forth and expressed or intended.”
In November, 1837, the next month after Gower was appointed, he completed his survey and. made a map of the city, showing thereon the lots and streets and alleys, etc., and certified it as required by law for the making of the town plats. This map made by Gower has been known as the Gower map ; it divided the Bartlett farm into large lots, showing Monroe street, Jefferson street and Madison street, and that Sixteenth street, Seventeenth street and Eighteenth street crossed the same substantially at right angles.
In the year 1840 said Bartlett farm is shown to have been owned as follows: Thomas H. Hubbard owned an undivided one-eighth, John Underhill an undivided one-eighth, J. W. Myers an undivided one-quarter, Henry W. Hicks an undivided seven-sixteenth, Hiram Pratt and F. P. Taylor an undived one-sixteenth, and the rest of the lands included in the Gower map were owned by various other parties. At various times in 1840 these several owners, except said Hubbard and Underhill, either by their attorneys in faht, or personally, executed the said Gower map and dedicated the streets and alleys therein, so far as they were interested therein, to the public in due form of law.
Sometime between 1840 and February 18th, 1843, this map was placed on file in the office of the county recorder of this county, where it, or a fae simile copy of it, has since remained. A map’that was shown in evidence was said to be either the original map or an engraven copy. ' On inspection, we are in- *322 dined to think it was the original map. However that maybe, it was either the original or a copy of it, and preserves the character of the signatures and everything regarding the map of consequence.
This map is not shown to have been recorded in the recorder’s office at all until many years after the date last mentioned, perhaps in 1876, when it was recorded among the regular plats of this county.
In this dedication, the said Hubbard, owner of one-eighth of the Bartlett farm, and Underhill, the owner of another eighth, did not join, and it is rather indicated, and perhaps shown, that they were non-residents of the county.
On the 18th of February, 1843, the council of this city passed a resolution to the effect that “ the map now in the hands of the recorder of Lucas county, Ohio, made by Robert Gower, be adopted as the city map of Toledo, in accordance with the provisions of the 28th section of the city charter; also, resolved-that the city clerk procure a suitable book and record the same therein.”
No formal action of the city has ever been taken to rescind the adoption of that map or plat, and no action taken by the city disturbing it, except so far as the taxation of the portions of the street, or the assessment of them for improvements, or various actions to condemn portions of the street, may bear upon that question.
In February, 1845, Henry W. Hicks, who then owned seven-sixteenths of the Bartlett farm, began an action in the court of common pleas of this county against his co-tenants for the partition of the Bartlett farm. He made all these owners parties to that proceeding, except that he did not name as defendants Hiram Pratt and F. B. Taylor, who owned the undivided one-sixteenth, but he designated this undivided one-sixteenth as owned by “ unknown owners.” That action was begun in February, 1845, and was pending for some time, and during the pendency of it, one. Charles M. Reed began a suit in the same court to foreclose a mortgage given to the Bank of Buffalo by this Pratt and Taylor upon their undivided one-sixteenth of this Bartlett farm and other property, making the parties who had given the mortgage parties to that pro *323 ceeding. These two actions, the partition brought by Hicks, and the foreclosure proceeding by Reed upon that mortgage, were pending at the same time in the court of common pleas here.
In this partition proceeding, commissioners in partition seem to have been regularly appointed, and they made partition of the Bartlett farm, and returned it to thé court of common pleas, by which it was confirmed. They set off to Hicks certain bounded parts in severalty, called parts number 1 and 2. To Underhill they set off a certain other tract called number 3, and to Hubbard another called number 4, and to Myers another, number 5, and they set-5ff tract number 6 to the “ unknown owners.” Tract number 6 was bounded by beginning at the intersection of the center line of Jefferson street with the easterly line of this Bartlett farm, and thence running along the center line of Jefferson street, northwesterly to the center line of “ 16th street ” (designating it in that way). Then along the center line of Sixteenth street to the Territorial road, and down the Territorial road to the east line of the Bartlett farm, and down that line to the place of beginning, “and including lots 6,19, 20, 36 & 37, according to the Gower map.” That included the half of Sixteenth street in the region here in controversy. It includes the part of the street obstructed by the defendant’s building. It also includes the lot owned by the plaintiff Daiber, but does not include the lot owned by Southard. The premises of Southard fall upon the portion that was set-off to Hubbard on the northwesterly side of Sixteenth street.
In the making of this plat, these streets, Jefferson, Sixteenth, Seventeenth, Eighteenth, and Nineteenth streets and others, appear in the Gower map, and nowhere else, so far as we have been able to find from the testimony. Recourse was had to the Gower map in the partition as if it were a thing known, for the purpose of making this description.
This allotment being confirmed by the court in the partition proceedings (that is, the partition thus made by the commissioners in partition), a decree was taken in the foreclosure suit by Reed, and this tract 6, which was thus aparted to unknown owners, but which really belonged *324 to Pratt and Taylor, was conveyed by a master commissioner, under the order of the court, to Charles M. Reed in 1846, about a month after the partition had been effected. That brings us to 1846.
In 1847, Jessup W. Scott, the father of the defendant, Maurice A. Scott (under whom defendant claims title to that portion of the street where the building is), claimed to own a certain 70 acres other than the Bartlett farm, but involved in this Gower plat. In 1847 he executed and acknowledged the Gower map that had been executed by the other parties to it in 1840, and which seems to have been, since 1843, at least, on file in the recorder’s office. In his execution of that plat he says he signs it only as regarding that 70 acres of land, describing it, and not as to any other land he may own in the limits of the plat. The record does not disclose that Jessup W. Scott had the title at that time to any part of this Bartlett farm, but from proceedings begun shortly after it might be inferred that he had some interest in a portion of the Bartlett farm that had formerly belonged to Pratt and Taylor. He executed that map. His attention was called to it, and he executed it, with the limitation that I mention.
In 1848, Jessup W. Scott began in Lucas County Court of Common Pleas a suit in partition against Charles M. Reed, who had purchased this part of the Bartlett farm at the foreclosure sale, and quite a number of other parties, for the partition of this land that had thus been partitioned to the “unknown owners,” and a large amount of other land; in that proceeding this part was described by Scott as in the commissioners’ return, that is, designating it as along the center line of Jefferson street to the center line of Sixteenth street, and so on. Seeming to recognize fully the partition proceedings of 1845.
In that partition proceeding Jessup W. Scott obtains the title' to this tract “ 6,” set off in the earlier partition proceedings to “ unknown owners.”
In 1850, shortly after the conclusion of this partition proceeding of 1848, brought by Scott, he takes a quit-claim deed from Charles M. Reed and wife of this property. In 1858 Jessup W. Scott makes a quit-claim deed to Frank J. Scott of *325 the lands now involved in this matter,'and uses therein the lot numbers as they appear upon the' Gower map. At about the same time Frank J. Scott executes a quit-claim to Susanna Scott, his mother, the wife of Jessup W. Scott, of this property, together with a large amount of other property. It is said these deeds came around by way of family arrangement. Mr. Scott, having used some money or property of his wife,'caused this conveyance to be made to her for the purpose of making that matter right.
Afterwards, in 1859, Jessup W. Scotland Susanna, his wife, deeded to Frank J. and Maurice Scott a large amount of land, and excepted certain lots as they appear upon the Gower map so-called. In 1865, in April, Frank J. and wife conveyed to-Maurice A. Scott a certain portion of this land bounded by, and referring in their description to, Madison street and Jefferson street and Fifteenth and “ Sixteenth street extended.n And Maurice A. Scott afterwards, in Febaruary, 1866, conveyed the premises now owned by- Daiber to Thomas-Bray, and used the same description, but bounded the lots upon the south-easterly line of Sixteenth street extended. Thomas Bray thereafter deeds to Sardis D. Curtis substantially the same premises, 40 feet on Jefferson street by 120 feet on Sixteenth street. Sardis D. Curtis deeds to Bell. Bell deeds toHillyard by substantially the same description; Hillyard to Sarah E. Smith, and Sarah E. Smith to Daiber. The deed to Daiber has this recital: u If Sixteenth street is widened or extended the grantee is to pay for the same.”'
Mr. Daiber thus gets his title to his lot.
Alter the making of this plat, the premises here in question were placed upon the tax duplicate and continued to be taxed under the designations and descriptions therein until 1859, wnen the tax assessor made a plat of his own of the tract, using therein the original commissioners’ report, it would seem, and thereafter the land involved in this Bartlett farm was placed upon the tax duplicate as described in this assessor’s plat of 1859. This plat included portions of these streets, including Sixteenth street, and taxes were levied and assessed upon this portion of Sixteenth street in that way for sometime.
*326 In 1865, or along in those years, proceedings were had by the city of Toledo to condemn portions of these streets (not including Sixteenth) running through the Bartlett farm, and portions of them were condemned and paid for as if they had never been dedicated.
In 1868 the city authorities provided and had placed in Sixteenth street, along the portion of it in question here, a sewer, and the expense of that was assessed along the streeti as in ordinary cases, and the assessment paid. Later along, perhaps in 1873 or 1874, action was taken to condemn this Sixteenth street along the portion of it in question, and proceedings were had. A jury was summoned, a certain amount for compensation was awarded to the alleged owners, of whom defendant was one. That was never paid, however, and the city did not proceed further under it.
Some time after that a similar proceeding was had, in the probate court, and taken by appeal to the common pleas court, judgment of condemnation again had and compensa-. tion awarded ; but that was never paid.
For the repair of certain portions of Jefferson street, and other purposes, special assessments were levied by the city from time to time upon this portion of Sixteenth street after the year 1870, so that the very portion on which the defendant is keeping his buildings was assessed specially for these improvements, and the assessments were paid. That is, the city, in that particular, treated it as private grounds and assessed it specially, as it had also taxed it.
It will be observed that while Pratt and Taylor (who were proceeded against as unknown owners in the partition proceeding) executed this Gower map of 1840, Hubbard and Underhill did not. But Hubbard and Underhill were parties to the partition proceeding of 1845, which recognize this Gower map and make descriptions in accordance with it. And after-wards they accepted the portion of the Bartlett farm thus falling to them, and conveyed certain portions of it, using descriptions as designated in the Gower map and treating these streets as if in fact streets. In fact, although Hubbard and Underhill appear as owners of land that did not join in that plat, all of the parties seem to have recognized the Gower map *327 and to have been acquainted with it, to have known the streets laid off and designated on that map, to have been apprised of the partition proceedings and the descriptions therein, and accepted their land thereunder. Everything of that kind, as if the plat had been made regularly and a regular statutory dedication had been made, down to 1865, when Frank J. Scott deeds to Maurice A. Scott. In fact Jessup W. Scott, having executed, as to other lands, this Gower map in 1847, afterwards gives a mortgage to one Emmons, describing lots by their Gower map numbers, and in all his conveyances recognizes the descriptions in the Gower map and the streets as laid out thereon. We fail to find that Jessup W. Scott, at any time, in any conveyance or proceeding, did .anything that looked in the direction of disclaiming the authority of the Gower map, or the laying out of the streets as designated therein, The first that appears in evidence as if that map was not to be regarded, and the streets not to be regarded as dedicated, appears when the portion of this land comes to be deeded by the sons of Jessup W. Scott.
It is also shown that there was executed in 1867 another plat involving a portion of this Bartlett farm called Mott’s Second Addition; it begins with what would be the northwestern line of Sixteenth street, and includes the land that had been set off under the partition proceeding • to Hubbard, and in this it designates Sixteenth, Seventeenth, Eighteenth and Nineteenth streets, and shows them laid off exactly as in the Gower map. It does not include all of Sixteenth street, however, but only comes to the center line thereof.
' In laying off the lots in this plat of Mott’s Second Addition, it proceeds to bound and abut lots upon this Sixteenth street, and among the lots that were thus laid off in Mott’s Second Addition in 1867, was the lot that afterwards came to be owned by plaintiff Southard. This lot was laid out and designated upon this Mott’s Second Addition, which was platted for Hubbard in proper form and duly recorded. This lot with others is bounded upon Sixteenth street, and upon no other designated street upon the plat. This plat thus seemed to have recognized Sixteenth street as a street upon which lots could be made to abut.
*328 In this way Hubbard is shown to have recognized the validity of these proceedings and to have known and recognized the authority of the Gower map, in which he did not join.
Mott owned the legal title as trustee under Hubbard, and made the title as trustee, and he affected the Hubbard interest by whatever he did in the premises.
Underhill, who was one of the original proprietors, but whose land did not join Sixteenth street in that portion of it in question here, in 1849 made a deed to one Poag, wherein, by his descriptions, he recognized the streets in question exactly as designated in the partition proceeding (and the Gower map) by which his portion of the land was set off.
Now, under these circumstances, the question presented is whether this Sixteenth street, 'in the part of it here in question, has been sufficiently dedicated as a public street, in such manner as that defendant Scott had no right to interrupt the use by the plaintiffs and the public for street purposes.
There are two ways in which dedication may be made— one under the statute, in which the terms of the statute may be substantially complied with, and the other a dedication at common law.
If this Gower map of 1840 had been executed by Hubbard and Underhill, as it had been by other proprietors, and had been recorded, there would have been no question at all but that it would make a regular statutory dedication under the provisions of the statute, and would have conveyed the fee of the streets to (he public authorities designated by the statute.
There were no authorities cited as to whether or not lands can thus be platted by owners of undivided interests without all the owners of the land joining in the statutory dedication. In general, it is certainly true, that to make a statutory dedication the owners of the land must join therein, and the plat must be executed as prescribed by statute. But whether, as in this case, certain of the owners of individual interests can make a statutory dedication, there has been no authority presented directly in point. Under the view of the case we take, it is, perhaps, unnecessary for us to determine whether or not that was, as to any of the proprietors, a statutory dedica *329 tion. The plat certainly went as far as this: to indicate the intention of the owners to join in .the plat and dedicate the streets and alleys therein mentioned to the public for public use. This act of the other owners was known to Hubbard, was known to Underhill, and they acquiesced in it,, made their deeds in accordance with it, and never made any objection to it in any way. The city by its resolution unequivocally accepted and adopted that plat with the streets and alleys thereon designated.
We are inclined to think, under these circumstances, that the intention of the owners of this land, all of them, was manifestly to dedicate the streets and alleys, as they appear upon that Gower map, to the public and for the public use; that the city of Toledo accepted that dedication, and that thereupon they becam'e dedicated streets. If that were so, then, whatever the city authorities might have done thereafter, unless they did such a thing as amounted to an absolute estoppel, they did not undo what they had thus done by the acceptance of the dedication.
When the city accepted taxes upon a portion of these streets,' it is not shown and does not clearly appear that the city’s attention was directed specially to that matter. Taxes were levied according to the Gower map for several years, taxing the lots and not the streets, afterwards by the assessors plat the city accepted taxes on the lots and streets. Thereafter it made assessments and assessed the portion of Sixteenth street in question. If, before that time, that street had become a regularly dedicated street, the mere fact of' the city assessing it wrongfully would not do away with its acceptance of it as a street or affect it as a street. It was wrongfully assessed, and parties might have resisted the collection of the assessment. It was assessed not to any particular party, and Scott saw fit to pay the assessments of his own accord.
The city also afterwards recognized the existence of this Sixteenth street not only by putting the sewer in it in 1868, but before that time there is evidence tending to show that to some extent it improved Sixteenth street.
In 1852 to 1858 (it was not clear by the testimony when it *330 occurred) this Bartlett farm was turned out to commons. Parties from time to time took occasion to drive across it.
There is some testimony tending to show that back at an earlier date than that, at least back as far as the opening of this Bartlett farm to the public, people drove across what is now claimed to be Sixteenth street somewhat frequently at times, owing to the condition of certain other roads. And that in later years, before 1884, when it was obstructed by Scott, it had been used continuously as a street. In those early days when the Bartlett farm was first laid open to the public, we cannot find that any great degree of travel occurred along Sixteenth street. There is some testimony of Scott and others that the line of this travel followed no particular route. A portion of it went diagonally and a portion of it not following any particular line, but it is admitted that of late years the travel has gone along and upon Sixteenth street.
It is in testimony also that at an early time a portion of Sixteenth street was graded, the city had some men there engaged in grading a portion of it; it does not appear whether the portion in question or some other portion. There is testimony to show that a portion of it was to some extent ditched quite a number of years ago.
Every person connected with the matter in any way, seems to have regarded these streets as regularly established streets, except so far as the city, during some years, taxed them or accepted taxes upon them, and made these assessments and undertook to condemn them.
These condemnation proceedings are said to show unequivocally that the city did not regard this portion of the street as a public street or it would not have sought to condemn it. But the same thing might be said regarding this as was said about the assessments — if it was a public street, the fact that some officers of the- city had brought a proceeding to condemn it would not affect the street or rescind the acceptance cf the street by the city.
It is also clear by the authorities that whatever rights the city may have, if as'to these private proprietors, there has been a valid dedication, they can insist upon the keeping of *331 the dedicated streets open, although the public authority itself may not be in position so to do. That is, if the parties holding under these dedicators have acquired rights in the plat and purchased abutting lots in accordance with and relying upon the location of the street, those private proprietors have a right in the street that cannot be taken away from them by mal feasance of the city itself.
There was one question which occurred to us, which was not presented in argument at all, a,nd" possibly is of no particular moment, but we mention it in passing. It seems by the proof that the plaintiff Daiber is not in possession of his particular tract by himself. He is not living upon it, but the dwelling-house upon it is occupied by his tenant, and this was the case at the time of the bringing of this action. Southard, with his family, occupies his lot himself. We have not taken pains to look up the authorities, whether or not under circumstances of this kind, the plaintiff Daiber could sustain an action. But the objection that might be made to his right because of not being in the personal possession of the premises cannot be made as to the plaintiff Southard; and in view of that, we shall treat the plaintiffs’ case together as it has been made, and render the decree accordingly. We are inclined to think, then, under all the circumstances, and the authorities, that this Sixteenth street obstructed by Mr. Scott had been intentionally dedicated by way of common law dedication by the owners of the land who had the right to dedicate it, and that this dedication was sufficiently accepted by the public. That the street was in 1884, and has since, been unwarrantably obstructed by these structures of the defendant. The plaintiffs are entitled to a perpetual injunction restraining defendant from continuing the obstruction of the street by the structures in question, and in case of his failure to discontinue the same, an order issue to the sheriff to abate the nuisance.
The decree of the court will be accordingly, the costs, of course, following against the defendant, in accordance with the finding of the court.